## BOB-LO EXCURSION CO. *v.* MICHIGAN.

No. 374.   Argued December 16–17, 1947.—Decided February 2, 1948.

*Wilson W. Mills* argued the cause and filed a brief for appellant.

*Edmund E. Shepherd,* Solicitor General of Michigan, argued the cause for appellee.   With him on the brief were *Eugene F. Black,* Attorney General, and *Daniel J. O'Hara,* Assistant Attorney General.

Briefs of *amici curiae* in support of appellee were filed by *William Maslow, Shad Polier, Jerome C. Eisenberg*

and *Jerome R. Hellerstein* for the American Jewish Congress; and *Thurgood Marshall, Osmond Fraenkel, O. John Rogge* and *Marian Wynn Perry* for the National Association for the Advancement of Colored People et al.

Mr. Justice Rutledge delivered the opinion of the Court.

Bois Blanc Island is part of the Province of Ontario, Canada. It lies just above the mouth of the Detroit River, some fifteen miles from Michigan's metropolis upstream. The island, known in Detroit by the corruption "Bob-Lo," has been characterized as that city's Coney Island.

Appellant owns almost all of Bois Blanc in fee.[1] For many years it has operated the island, during the summer seasons, as a place of diverse amusements for Detroit's varied population. Appellant also owns and operates two steamships for transporting its patrons of the island's attractions from Detroit to Bois Blanc and return. The vessels engage in no other business on these trips.[2] No freight, mail or express is carried; the only passengers are the patrons bent on pleasure, who board ship at Detroit;

---

[1] A small fenced-off tract at one end is reserved for lighthouse purposes, and three small cottage lots. Appellant is a Michigan corporation, authorized by its charter to "lease, own and operate amusement parks in Canada, and to charter, lease, own and operate excursion steamers and ferry boats in interstate and foreign commerce, together with dock and terminal facilities pertaining thereto," as well as to acquire, own, use and dispose of real and personal property "as may be necessary or convenient in connection with the aforesaid business of the company."

[2] The record shows that at times during the season appellant uses these ships to provide excursion trips for residents of the Province of Ontario, but these excursions are kept entirely separate from those between Detroit and Bois Blanc and we are concerned with no question relating to them.

they go on round-trip one-day-limit [3] tickets which include the privilege of landing at Bois Blanc and going back by a later boat.[4]  No intermediate stops are made on these excursions.

In conducting this business of amusement and transportation, appellant long has followed the policy, by advertisement and otherwise, to invite and encourage all comers, except two classes.  One is the disorderly; the other, colored people.[5]  From the latter exclusion this case arises.

In June of 1945 Sarah Elizabeth Ray, the complaining witness, was employed by the Detroit Ordnance District. She and some forty other girls were also members of a class conducted at the Commerce High School under the auspices of the ordnance district.  The class planned an excursion to Bois Blanc for June 21 under the district's sponsorship.

On that morning thirteen girls with their teacher appeared at appellant's dock in Detroit to go on the outing. All were white except Miss Ray.  Each girl paid eighty-five cents to one of the group, who purchased round-trip tickets and distributed them.  The party then passed

---

[3] Apparently no facilities are provided at the island for overnight guests.

[4] The company fixes its own rates.  The usual round-trip charge is 85¢, except for Saturday nights and Sundays when a higher rate applies.  Special excursions at times are arranged for churches, Sunday schools, clubs, lodges, etc., for which the regular charge is paid by the passenger but the company allows the organization a discount which permits it to make a profit.  The discounts are not uniform.

[5] Appellant's assistant general manager, Devereaux, testified: "The defendant adopted the policy of excluding so-called 'Zoot-suiters,' the rowdyish, the rough and the boisterous and it also adopted the policy of excluding colored."

Appellant printed on the back of each ticket: "Right reserved to reject this ticket by refunding the purchase price."  The record contains no evidence of any exclusion or policy of exclusion of others than disorderly or colored persons.

through the gate, each member giving in her ticket without question from the ticket taker. They then checked their coats, went to the upper decks and took chairs.

Shortly afterward Devereaux, appellant's assistant general manager, and a steward named Fox appeared and stated that Miss Ray could not go along because she was colored. At first she remonstrated against the discrimination and refused to leave. But when it appeared she would be ejected forcibly, she said she would go. Devereaux and Fox then escorted her ashore, saying the company was a private concern and could exclude her if it wished. They took her to the ticket office and offered to return her fare. She refused to accept it, took their names, and left the company's premises. There is no suggestion that she or any member of her party was guilty of unbecoming conduct. Nor is there any dispute concerning the facts.

This criminal prosecution followed in the Recorder's Court for Detroit, for violation of the Michigan civil rights act [6] in the discrimination practiced against Miss Ray. Jury trial being formally waived, the court after hearing evidence and argument found appellant guilty as charged and sentenced it to pay a fine of $25.[7] On appeal the Supreme Court of Michigan affirmed the judgment, holding the statute applicable to the circumstances presented by the case and valid in that application, as against the constitutional and other objections put forward. 317 Mich. 686. In due course probable jurisdiction was noted here. Judicial Code § 237 (a).

[6] Mich. Penal Code §§ 146–148, as amended by Act No. 117, Mich. Pub. Acts 1937; Mich. Comp. Laws (Supp. 1940) §§ 17115–146 to 17115–148; Mich. Stat. Ann. (1946 Cum. Supp.) §§ 28.343–28.346. These sections of the Penal Code reenacted and broadened the application of Act No. 130, Mich. Pub. Acts 1885. See notes 8 and 10.

[7] Appellant's motion for "directed" verdict of not guilty was denied, as was also its motion after judgment for a new trial. The trial court filed a written opinion which is unreported.

The Michigan civil rights act, § 146, enacts:

"All persons within the jurisdiction of this state shall be entitled to full and equal accommodations, advantages, facilities and privileges of inns, hotels, restaurants, eating houses, barber shops, billiard parlors, stores, public conveyances on land and water, theatres, motion picture houses, public educational institutions, in elevators, on escalators, in all methods of air transportation and all other places of public accommodation, amusement, and recreation, where refreshments are or may hereafter be served, subject only to the conditions and limitations established by law and applicable alike to all citizens and to all citizens alike, with uniform prices." [8]

By § 147, any owner, lessee, proprietor, agent or employee of any such place who directly or indirectly withholds any accommodation secured by § 146, on account of race, creed or color, becomes guilty of a misdemeanor, punishable as the section states, and liable to a civil action for treble damages.[9]

---

[8] The appropriate statutory citations are set forth in note 6.

[9] Section 147 is as follows: "Any person being an owner, lessee, proprietor, manager, superintendent, agent or employe of any such place who shall directly or indirectly refuse, withhold from or deny to any person any of the accommodations, advantages, facilities and privileges thereof or directly or indirectly publish, circulate, issue, display, post or mail any written or printed communications, notice or advertisement to the effect that any of the accommodations, advantages, facilities and privileges of any such places shall be refused, withheld from or denied to any person on account of race, creed or color or that any particular race, creed or color is not welcome, objectionable or not acceptable, not desired or solicited, shall for every such offense be deemed guilty of a misdemeanor and upon conviction thereof shall be fined not less than twenty-five dollars or imprisoned for not less than fifteen days or both such fine and imprisonment in the discretion of the court; and every person being an owner, lessee, proprietor, manager, superintendent, agent

The Michigan statute is one of the familiar type enacted by many states before and after this Court's invalidation of Congress' similar legislation in the *Civil Rights Cases,* 109 U. S. 3.[10] The Michigan Supreme Court held the statute applicable to appellant's business over its objection that as a matter of local law it is not a "public conveyance" within the meaning of § 146.[11] We accept this conclusion of the state court as a matter of course. That court also impliedly rejected appellant's

or employe of any such place, and who violates any of the provisions of this section, shall be liable to the injured party, in treble damages sustained, to be recovered in a civil action: *Provided, however,* That any right of action under this section shall be unassignable."

No suggestion is made that the phrase "on account of race, creed or color" does not apply to the withholding and denying provisions of the section as well as those relating to publishing, etc., the notices or advertisements specified.

Section 148 of the Act forbids discrimination because of race, creed or color in selecting grand and petit jurors.

[10] These cases were decided in 1883. The Michigan statute was enacted originally in 1885. Seventeen other states have similar, and in many instances substantially identical, legislation. The statutory citations are given in *Morgan* v. *Virginia,* 328 U. S. 373, 382, n. 24.

[11] Appellant urged that it was not a common carrier, a public utility, or a "public conveyance" within the specific terms of § 146. The state supreme court said: "There is no escape from the conclusion that defendant herein is engaged in the business of operating 'public conveyances' by water, and the Michigan statute provides: 'All persons within the jurisdiction of this State shall be entitled to full and equal accommodations' afforded by such conveyances. The Michigan enactment has been held constitutional. *Bolden* v. *Grand Rapids Operating Corp.,* 239 Mich. 318 (53 A. L. R. 183). Our conclusion is . . . that the Michigan civil rights act . . . is applicable to the business carried on by defendant . . . ." 317 Mich. 686, 695.

The court distinguished *Meisner* v. *Detroit, Belle Isle & Windsor Ferry Co.,* 154 Mich. 545, in which appellant's corporate predecessor was held not liable in tort for breach of an alleged duty as a common carrier of passengers, by pointing out that no right apparently had been asserted in that case grounded on the state civil rights act. 317 Mich. 686, 696.

constitutional objections based upon alleged denial of due process of law and equal protection of the laws under the Fourteenth Amendment, issues now eliminated from the case.[12]

We have therefore only to consider the single and narrow question whether the state courts correctly held that the commerce clause, Art. I, § 8, of the Federal Constitution, does not forbid applying the Michigan civil rights act to sustain appellant's conviction. We agree with their determination.

There can be no doubt that appellant's transportation of its patrons is foreign commerce within the scope of Art. I, § 8.[13] *Lord* v. *Steamship Co.,* 102 U. S. 541; cf. *Edwards* v. *California,* 314 U. S. 160. Appellant's vessels sail to and from a port or place in foreign territory wholly under another nation's sovereignty. They cross the international boundary, which is the thread of the Detroit River, several times in the course of each short

---

[12] The jurisdictional statement sought review of these Fourteenth Amendment questions, as well as the commerce clause issue. But appellant's reply brief states: "The cause before us is a business case arising under the Michigan Civil Rights Act and the Commerce Clause; *not* one arising under the [federal] Civil Rights Act and the 14th Amendment." And we were given to understand at the oral argument, in response to specific inquiry, that the only issue on which decision was sought as of that time was the commerce clause question.

The Michigan Supreme Court did not refer explicitly in its opinion to appellant's Fourteenth Amendment contentions, but the record shows they were presented to that court in the assignments of error on appeal and were therefore necessarily rejected by its affirmance of the judgment of the Recorder's Court.

[13] Until the case reached this Court, apparently, the state had maintained that foreign commerce was not involved and the trial court so held, although the ruling was hedged with the further one that, if it was erroneous, still the state's power to apply the civil rights act was not nullified by the commerce clause.

trip. Appellant necessarily complies with federal regulations applicable to foreign commerce, including those governing customs, immigration and navigation matters. It likewise satisfies similar regulations of the Canadian authorities.[14]

Of course we must be watchful of state intrusion into intercourse between this country and one of its neighbors. But if any segment of foreign commerce can be said to have a special local interest, apart from the necessity of safeguarding the federal interest in such matters as immigration, customs and navigation, the transportation of appellant's patrons falls in that characterization. It would be hard to find a substantial business touching foreign soil of more highly local concern. Except for the small fenced-off portion reserved for the lighthouse and three cottage sites,[15] the island is economically and socially, though not politically, an amusement adjunct of the city of Detroit. Not only customs and immigrations regulations of both countries, but physical barriers prevent intercourse, both commercial and social, between Canadians and appellant's patrons, except as the former may come first by other means to Detroit, then go to the island from American soil on appellant's vessels, and return from the holiday by the same roundabout route.

---

[14] *E. g.,* on arrival at Bois Blanc all passengers who land pass through Canadian customs and immigration inspection. Prior to the late war, on returning to Detroit, similar inspections were made by United States authorities. During the war the latter inspection was suspended, appellant filing a bond to indemnify the Treasury against loss of revenue and expenses arising from any free importation of dutiable goods from Bois Blanc or Canada and an agreement with the Immigration Service not to bring in aliens ineligible for entry.

[15] It does not appear whether these sites are inhabited, but presumably a keeper of the lighthouse occupies some part of the reserved premises.

The record indicates there are no established means of access from the Canadian shore to the island. There is no evidence of even surreptitious entry from the Canadian mainland. Appellant's vessels not only are the sole means of transportation to and from the island, but carry only its own patrons of Bois Blanc's recreational facilities. These travel exclusively on round-trip tickets for passage beginning and ending on American soil. They are principally residents of Detroit and vicinity. All go aboard there and return the same day. None go from the island to the Canadian bank of the river. The only business conducted at the island is the operation of appellant's recreational and accessory facilities, which apparently do not include provision for overnight guests. No other persons than appellant's patrons come to the island, or have a right to come, from Canada's mainland or elsewhere, or go from the island to Detroit.

The sum of these facts makes Bois Blanc an island in more than the geographic sense. They insulate it and appellant's business done in connection with it from all commercial or social intercourse and traffic with the people of another country usually characteristic of foreign commerce, in short from the normal flow and incidents of such commerce. Since the enterprise is conducted in this highly closed and localized manner with Canada's full consent, no detraction whatever from that friendly neighbor's sovereignty is implied by saying that the business itself is economically and socially an island of local Detroit business, although so largely carried on in Canadian waters. As now conducted, apart from presently applicable Canadian and federal regulations and until Canada or Congress or both countries by treaty see fit to add others, the business is of greater concern to Detroit and the State of Michigan than to Dominion or Ontario interests or to those of the United States in regulating our foreign commerce.

The regulation in this application contains nothing out of harmony, much less inconsistent, with our federal policy in the regulation of commerce between the two countries; nor, so far as we are advised, with Canadian law and policy.[16] Appellant urges, however, that Canada might adopt regulations in conflict with Michigan's civil rights act, thus placing it in an inescapable dilemma if that act may be applied to its operations. Conceding the possibility, we think the state is right in viewing it as so remote that it is hardly more than conceivable. The same thing, we think, is true of the possibility that Congress might take conflicting action.

If therefore in any case a state may regulate foreign commerce, the facts here would seem clearly to justify Michigan's application of her civil rights act. It is far too late to maintain that the states possess no regulatory powers over such commerce. From the first meeting of Congress they have regulated important phases of both foreign and interstate commerce, particularly in relation to transportation by water, with Congress' express con-

---

[16] The Province of Ontario enacted in 1944 its Racial Discrimination Act, Session Laws 1944, c. 51.

Federal legislation has indicated a national policy against racial discrimination in the requirement, not urged here to be specifically applicable in this case, of the Interstate Commerce Act that carriers subject to its provisions provide equal facilities for all passengers, 49 U. S. C. § 3 (1), extended to carriers by water and air, 46 U. S. C. § 815; 49 U. S. C. §§ 484, 905. Cf. *Mitchell* v. *United States*, 313 U. S. 80. Federal legislation also compels a collective bargaining agent to represent all employees in the bargaining unit without discrimination because of race. 45 U. S. C. §§ 151 *et seq. Steele* v. *Louisville & Nashville R. Co.*, 323 U. S. 192; *Tunstall* v. *Brotherhood of Locomotive Firemen & Enginemen*, 323 U. S. 210. The direction of national policy is clearly in accord with Michigan policy. Cf. also *Hirabayashi* v. *United States*, 320 U. S. 81; *Korematsu* v. *United States*, 323 U. S. 214; *Ex parte Endo*, 323 U. S. 283.

sent.[17]   And without such consent for nearly a hundred years they have exercised like power under the local diversity branch of the formula announced in *Cooley* v. *Board of Wardens,* 12 How. 299.[18]   See *Union Brokerage Co.* v. *Jensen,* 322 U. S. 202; *Kelly* v. *Washington,* 302 U. S. 1 and authorities cited in both cases.   Indeed the *Cooley* criterion has been applied so frequently in cases concerning only commerce among the several states that it is often forgotten that that historic decision dealt indiscriminately with such commerce and foreign commerce.[19]

---

[17] It is hardly necessary to recall again that by the Act of August 7, 1789, the First Congress declared that pilotage in bays, inlets, rivers, harbors and ports of the United States should continue to be regulated in conformity with existing state laws or others thereafter enacted until further action by Congress.  1 Stat. 54.  Congress on occasion has modified such state legislation, *e. g.,* by the Act of March 2, 1837, 5 Stat. 153, making it lawful for vessels navigating waters constituting the boundary between two states to take on pilots qualified under the laws of either.

[18] In *Olsen* v. *Smith,* 195 U. S. 332, the Court sustained a Texas statute regulating pilotage of a British vessel coming from a foreign port.  The contention that the state was without power to legislate in this field was disposed of in one sentence.  "The unsoundness of this contention is demonstrated by the previous decisions of this court, since it has long since been settled that even although state laws concerning pilotage are regulations of commerce, 'they fall within that class of powers which may be exercised by the States until Congress has seen fit to act upon the subject.' [citing the *Cooley* and other cases]."  195 U. S. 341.  Other cases upholding state regulation of foreign commerce are to the same effect.  *Steamship Co.* v. *Joliffe,* 2 Wall. 450; *Wilson* v. *McNamee,* 102 U. S. 572; *Anderson* v. *Pacific Coast S. S. Co.,* 225 U. S. 187.  Cf. *Clyde Mallory Lines* v. *Alabama,* 296 U. S. 261, and cases cited; *Pigeon River Co.* v. *Cox Co.,* 291 U. S. 138, 158–159.

[19] The Court's opinion in that case deals expressly but indiscriminately with both types of commerce.  And from the record and arguments of counsel it seems clear that both were actually involved. There were two cases relating to two different vessels, the Consul,

Appellant hardly suggests that the power of Congress over foreign commerce excludes all regulation by the states. But it verges on that view in regarding *Hall* v. *DeCuir,* 95 U. S. 485, supplemented by *Morgan* v. *Virginia,* 328 U. S. 373, and *Pryce* v. *Swedish-American Lines,* 30 F. Supp. 371, as flatly controlling this case. We need only say that no one of those decisions is comparable in its facts, whether in the degree of localization of the commerce involved; in the attenuating effects, if any, upon the commerce with foreign nations and among the several states likely to be produced by applying the state regulation; or in any actual probability of conflicting regulations by different sovereignties. None involved so completely and locally insulated a segment of foreign or interstate commerce.[20] In none was the business affected merely an adjunct of a single locality or community as is the business here so largely. And in none was a complete exclusion from passage made. The *Pryce* case, of course, is not authority in this Court, and we express no opinion on the problem it presented. The regulation of traffic along the

which was engaged in coastwise trade between Philadelphia and New York, and the Undine, which appears to have been engaged exclusively in foreign commerce. The destination, whether foreign or domestic, of the Undine is not shown by the record, which merely states that it sailed "from the port of Philadelphia to a certain port not within the river Delaware . . . ." But from the specific "addition" by counsel for argumentative purposes, 12 How. at 302–303, of the facts that the Consul held a federal coasting license and was bound from one domestic port to another, plus the omission of any reference in argument or in the record to a similar license for the Undine (when such a reference would have supported the additional argument), the inference seems justified that the Undine had sailed for a foreign port. Moreover counsel argued that both ships were engaged in foreign commerce, although only the Consul was engaged in coastwise trading.

[20] Cf. *Port Richmond Ferry* v. *Hudson County,* 234 U. S. 317, 331–332.

Mississippi River, such as the *Hall* case comprehended, and of interstate motor carriage of passengers by common carriers like that in the *Morgan* case, are not factually comparable to this regulation of appellant's highly localized business, and those decisions are not relevant here.

It is difficult to imagine what national interest or policy, whether of securing uniformity in regulating commerce affecting relations with foreign nations or otherwise, could reasonably be found to be adversely affected by applying Michigan's statute to these facts or to outweigh her interest in doing so. Certainly there is no national interest which overrides the interest of Michigan to forbid the type of discrimination practiced here. And, in view of these facts, the ruling would be strange indeed, to come from this Court, that Michigan could not apply her long-settled policy against racial and creedal discrimination to this segment of foreign commerce, so peculiarly and almost exclusively affecting her people and institutions.

The Supreme Court of Michigan concluded "that holding the provisions of the Michigan statute effective and applicable in the instant case results only in this, defendant will be required in operating its ships as 'public conveyances' to accept as passengers persons of the negro race indiscriminately with others. Our review of this record does not disclose that such a requirement will impose any undue burden on defendant in its business in foreign commerce." 317 Mich. 686, 694. Those conclusions were right.

The judgment is

*Affirmed.*

MR. JUSTICE DOUGLAS, concurring.

The case is, I think, controlled by a principle which cuts deeper than that announced by the Court and which is so important that it deserves to be stated separately.

*Hall* v. *DeCuir,* 95 U. S. 485, and *Morgan* v. *Virginia,* 328 U. S. 373, presented phases of the problem of segregation. The former held unconstitutional a Louisiana law forbidding steamboats (which plied the Mississippi) from segregating passengers according to race. The latter held unconstitutional a Virginia law requiring segregation of passengers on interstate motor buses. It was held that diverse regulations of that character by the several States through which the traffic moved would be an undue or unreasonable burden on interstate commerce. But the question here is a simpler one. It is whether a State can prevent a carrier in foreign commerce from denying passage to a person because of his race or color. For this is a case of a discrimination against a Negro by a carrier's complete denial of passage to her because of her race.

It is unthinkable to me that we would strike down a state law which required all carriers—local and interstate—to transport all persons regardless of their race or color. The common-law duty of carriers was to provide equal service to all, a duty which the Court has held a State may require of interstate carriers in the absence of a conflicting federal law. *Missouri Pacific R. Co.* v. *Larabee Flour Mills Co.,* 211 U. S. 612, 619, 623–624. And the police power of a State under our constitutional system is adequate for the protection of the civil rights of its citizens against discrimination by reason of race or color. *Railway Mail Assn.* v. *Corsi,* 326 U. S. 88. Moreover, in this situation there is no basis for saying that the Commerce Clause itself defeats such a law. This regulation would not place a burden on interstate commerce within the meaning of our cases. It does not impose a regulation which discriminates against interstate commerce or which, by specifying the mode in which it shall be conducted, disturbs the uniformity essential to its proper functioning. See *Southern*

*Pacific Co.* v. *Arizona,* 325 U. S. 761; *Morgan* v. *Virginia, supra.* I see nothing in the Commerce Clause which places foreign commerce on a more protected level.

There is in every case, of course, a possibility that Congress may pass laws regulating foreign or interstate commerce in conflict with regulations prescribed by a State. Or in the case of foreign commerce the national government might act through a treaty. Inconsistent State law would then give way to any exercise of federal power within the scope of constitutional authority. But I am aware of no power which Congress has to create different classes of citizenship according to color so as to grant freedom of movement in the channels of commerce to certain classes only. Cf. *Edwards* v. *California,* 314 U. S. 160, 177–181. The federal policy reflected in Acts of Congress indeed bars any such discrimination (see *Mitchell* v. *United States,* 313 U. S. 80) and so is wholly in harmony with Michigan's law. And no treaty reveals a different attitude.

Moreover, there is no danger of burden and confusion from diverse state laws if Michigan's regulation is sustained. If a sister State undertook to bar Negroes from passage on public carriers, that law would not only contravene the federal rule but also invade a "fundamental individual right which is guaranteed against state action by the Fourteenth Amendment." *Mitchell* v. *United States, supra,* p. 94. Nothing short of at least "equality of legal right" (*Missouri ex rel. Gaines* v. *Canada,* 305 U. S. 337, 350) in obtaining transportation can satisfy the Equal Protection Clause. Hence I do not see how approval of Michigan's law in any way interferes with the uniformity essential for the movement of vehicles in commerce. The only constitutional uniformity is uniformity in the Michigan pattern.

If a State's law made a head-on collision with the policy of a foreign power whose shores were reached by our vessels, a different problem might be presented. But no such conflict is present here.

MR. JUSTICE BLACK, who joins in the opinion of the Court, concurs also in this opinion.

MR. JUSTICE JACKSON, with whom THE CHIEF JUSTICE agrees, dissenting.

This Michigan statute undoubtedly is valid when applied to Michigan intrastate commerce, just as a Congressional enactment of like tenor would undoubtedly be valid as to commerce among the states and with foreign countries. The question here, however, is whether the Michigan statute can validly be applied to that commerce which is set apart by the Constitution for regulation by the Congress.

The sphere of a state's power has not been thought to expand or contract because of the policy embodied in a particular regulation. A state statute requiring equality of accommodations for white and Negro passengers was held invalid as applied to interstate commerce. *Hall* v. *DeCuir*, 95 U. S. 485. On the same principle a state statute requiring segregation was held invalid as applied to interstate commerce. *Morgan* v. *Virginia,* 328 U. S. 373. Heretofore the Court steadily has held that the failure of Congress to enact a law on this specific subject does not operate to expose interstate commerce to the burden of local rules, no matter what policy in this highly controversial matter a state sought to advance. It would seem to me that the constitutional principles which have been so apparent to the Court that it would not permit local policies to burden national commerce, are even more obvious in relation to foreign commerce.

Certainly if any state can enforce regulations concerning embarkation and landing, it can in effect control much that pertains to the foreign journey. To determine what persons and commodities shall be taken abroad is to control what persons and commodities may become the subject of foreign commerce, and that is to control the life-blood of the commerce itself. These are identical with matters in which this commerce is subject to control by federal and foreign governments. The Federal Government takes active control of the inbound movement of goods by virtue of its customs service and of the movement of persons by virtue of its immigration service across these boundaries. The Canadian government does the same on the outbound crossing of the international line. It does so in this case, and it does so even if the bulk of the travelers do not go very far or stay very long and are merely amusement bent.

The wholesome and amiable situation detailed in the Court's opinion is made possible only by international relations wholly controlled by the Federal Government. It alone can effectively protect or foster this kind of commerce, and it alone should be allowed to burden it. If we are to concede this power over foreign commerce to one state, it would seem that it could logically be claimed by every state which has a port, border, or landing field used by foreign commerce.

The Court admits that the commerce involved in this case is foreign commerce, but subjects it to the state police power on the ground that it is not very foreign. It fails to lay down any standard by which we can judge when foreign commerce is foreign enough to become free of local regulation. The commerce involved here is not distinguishable from a great deal of the traffic across our Canadian and Mexican borders, except perhaps in volume. Communities have sprung up on either side, whose social

and economic relations are interdependent, but are conducted with scrupulous regard for the international boundary. Localities on either side of the line may develop in reliance on a certain reciprocity and stability of policy which has characterized two nations for years, when they cannot rely on similar stability or farsightedness in local policy.

It seems to me no adequate protection of foreign commerce from a multitude and diversity of burdening and capricious local regulations that this Court may stand ready, as in this case, to apply itself to an analysis of the traffic involved and determine in each case whether the local interest in it is sufficiently strong and the foreign element is sufficiently weak so that we will permit the regulation to stand. We do not and apparently cannot enunciate any legal criteria by which those who engage in foreign commerce can predict which classification we will impose upon any particular operation and we lay down no rule other than our passing impression to guide ourselves or our successors. All is left to case-by-case conjecture. The commerce clause was intended to promote commerce rather than litigation.

I believe that once it is conceded, as it is in this case, that the commerce involved is foreign commerce, that fact alone should be enough to prevent a state from controlling what may, or what must, move in the stream of that commerce.