332 Mich. 291 (1952)
50 N.W.2d 884
CHICAGO, MILWAUKEE, ST. PAUL & PACIFIC RAILROAD COMPANY
v.
PUBLIC SERVICE COMMISSION.
Docket No. 13, Calendar No. 44,891.
Supreme Court of Michigan.
Decided January 8, 1952.
Carson L. Taylor, Thomas H. Maguire, J.E. Goggin, and Ballard, Jennings, Bishop & Fraser, for plaintiff.
Frank G. Millard, Attorney General, Edmund E. Shepherd, Solicitor General, and Charles M.A. Martin and Albert J. Thorburn, Assistants Attorney General, for defendant.
*293 BUSHNELL, J.
Plaintiff Chicago, Milwaukee, St. Paul & Pacific Railroad Company, a Wisconsin corporation, referred to in this opinion as the Milwaukee road, operates 2 trains designated as "The Copper Country Limited" and "The Chippewa."
The Copper Country Limited originates daily at Chicago, travels through Illinois, Wisconsin and Michigan, and terminates at Champion, Michigan, west of Negaunee and Marquette. The entire train, with the exception of its engine, is there delivered to the Duluth, South Shore & Atlantic Railway, hereinafter referred to as the South Shore, which then takes the train over its own tracks through various Michigan communities and terminates at Calumet. The procedure is reversed on the south bound trip which terminates at Chicago. The Chippewa is a streamlined passenger, mail and express train which originates at Chicago and goes to Channing, Michigan, from which point a portion of the train continues to Ontonagon, Michigan, without leaving the Milwaukee tracks. This territory is also served by the Chicago & North Western, which operates between Chicago and Negaunee.
Upon complaints in 1947 by civic organizations of Marquette, Houghton, Escanaba and Calumet, and individual residents in the Upper Peninsula, defendant Michigan public service commission, acting upon its own motion, ordered an investigation into the adequacy of transportation service then being furnished and rendered by these railroad companies. Public hearings were held at Marquette and Houghton and the testimony of interested persons was taken by one of the members of the commission. This testimony was principally directed to the inadequacy of transportation in interstate movements.
The South Shore, which operates from Marquette to Calumet, appeared at one of these hearings, and its superintendent suggested that if the Milwaukee *294 would extend the run of the Chippewa from Channing to Champion, the South Shore would pick up cars at Champion for Marquette and then take them to Calumet, in order to make a return connection later at Champion with the Milwaukee. As a result of these hearings the commission entered an "interim" order on September 16, 1947, directing the Milwaukee to provide such service.
The Milwaukee was granted an extension of the date of compliance, and thereafter filed a petition for reconsideration and vacation of the interim order. It was asserted that the commission lacked jurisdiction of the subject matter and that obedience to its interim order would cause the Milwaukee to violate certain sections of the interstate commerce act.
Further hearings were conducted by the commission and testimony was produced which emphasized the difficulties in traveling to and from the Upper Peninsula and in traveling from one part of Michigan to another. On July 22, 1948, the commission vacated the interim order and issued another. It stated that:
"The jurisdiction of this commission has been challenged upon the ground that the train service to be ordered furnished by railroad carriers operating in the Upper Peninsula of Michigan, might carry or connect with interstate commerce, and therefore come under the jurisdiction of the interstate commerce commission. We feel this objection to be without merit in the instant proceedings. We are primarily addressing ourselves to securing additional, necessary, intrastate rail service for the Upper Peninsula, and simply because such intrastate passenger service may carry or connect with interstate service, it does not deprive this commission of jurisdiction to make such reasonable order or orders as will accomplish this purpose."
*295 In the new order the Milwaukee was required to run the Chippewa, or a portion of it, after its arrival from the south at Channing at 7:55 p.m. through to Champion, arriving there approximately at 9:15 p.m. or, in the alternative, to provide a passenger train to be operated between Channing and Champion on the same schedule. It was further ordered to schedule and operate a passenger train between Champion and Channing, leaving Champion at approximately 12:40 p.m., and connecting with the southbound Chippewa leaving Channing at 2 p.m. The South Shore was ordered to adjust its schedule to make connection with the Milwaukee at Champion and to carry the Milwaukee passenger coach to Marquette, and from there to Calumet, and back to Champion.
The Milwaukee filed a bill of complaint in the Ingham county circuit court to set aside this order and restrain it from requiring any further operations thereunder. It contended that the commission was without jurisdiction and that the order was so unreasonable, arbitrary, prejudicial and confiscatory as to deprive it of property without due process of law.
The trial judge, after hearing testimony, concluded that:
"The primary objective and real purpose of the defendant commission was, and is by its order, to secure an additional interstate operation which is outside its authority to order, and that the intrastate operation was an afterthought, secondary, and belatedly shown, to accomplish its primary objective. Even though inadequate intrastate train service may exist, nevertheless the commission, in my opinion, can not order that inadequacy eliminated for the real purpose, as appears here, of having additional interstate service emanate therefrom."
*296 A decree was entered setting aside the order of the commission and restraining it from requiring any further operations thereunder.
In Michigan Central R. Co. v. Michigan Railroad Commission, 183 Mich 6 (Ann Cas 1916E 695), and People v. White, 197 Mich 283, it is stated, in substance, that the power of Congress to regulate interstate commerce is paramount, exclusive, and broad in its scope. It is, however, well settled that, in the absence of conflicting legislation by Congress, a State may regulate commerce within its borders, although interstate commerce may be affected as long as the State's action does not discriminate against or unreasonably burden interstate commerce, and is related to a matter of local concern. People v. Bob-Lo Excursion Co., 317 Mich 686; Bob-Lo Excursion Co. v. Michigan, 333 US 28 (68 S Ct 358, 92 L ed 455).
In Cities Service Gas Co. v. Peerless Oil & Gas Co., 340 US 179, 186 (71 S Ct 215, 95 L ed 190), the court said in this respect:
"The only requirements consistently recognized have been that the regulation not discriminate against or place an embargo on interstate commerce, that it safeguard an obvious State interest, and that the local interest at stake outweigh whatever national interest there might be in the prevention of State restrictions."
The Chippewa is operated by the Milwaukee in interstate commerce, and the validity of the order of the commission which affects that operation must be judged by the standards laid down by the Federal courts.
The question, therefore, is whether the order of the commission is in furtherance of safeguarding an "obvious State interest" or whether, as found by the trial judge, it is an attempt to "secure an additional interstate operation."
*297 The commission argues that it found an inadequacy in intrastate transportation in the Upper Peninsula of Michigan and issued its order for the purpose of improving such transportation. An examination of the testimony and the proceedings conducted by the commission reveals both a need for additional intrastate service and an improvement in interstate service.
The original complaints upon which the investigation was begun, and the hearings conducted, were directed to the improvement of interstate operations. Not until the Milwaukee interposed the jurisdictional objection to the interim order did the commission take testimony as to intrastate needs. The final order of the commission, although purportedly based on intrastate needs, differs in no material particulars from its interim order. Although intrastate commerce may be benefited, the plan ordered by the commission is primarily an attempt to regulate interstate commerce by increasing the facilities for travel between the Upper Peninsula and points in other States. The validity of the order must be determined in the light of its dominant purpose. See the following with respect to this phase of the matter: Southern Pacific Co. v. Interstate Commerce Commission, 219 US 433, 449 (31 S Ct 288, 55 L ed 283); Interstate Commerce Commission v. Union Pacific R. Co., 222 US 541 (32 S Ct 108, 56 L ed 308); and Interstate Commerce Commission v. Northern Pacific R. Co., 216 US 538 (30 S Ct 417, 54 L ed 608). The order of the commission cannot impose an unreasonable burden on interstate commerce. See Lake Shore & Michigan Southern R. Co. v. Ohio, ex rel. Lawrence, 173 US 285 (19 S Ct 465, 43 L ed 702), and Missouri Pacific R. Co. v. Kansas, ex rel. Railroad Com'rs, 216 US 262 (30 S Ct 330, 54 L ed 472). However, the commission is without power to regulate *298 interstate commerce as attempted by its final order.
The testimony in the circuit court indicates that the additional operation ordered by the commission would cost the Milwaukee a minimum of $51,644 a year, in addition to the present operating deficit, between Channing and Champion, of about $16,000. The intrastate revenue from passenger coach train service in Michigan by the Milwaukee during 1947 amounted to only $10,625.
It should be noted that the Chicago & North Western has a streamliner passenger train leaving Chicago at 4:10 p.m. daily, arriving at Negaunee at 11:49 p.m. and departing from Negaunee at 7:16 a.m., arriving at Chicago at 2:50 p.m.; that Negaunee is approximately 11 miles west of Marquette, and that a bus line operates between Negaunee and Marquette.
The Copper Country Limited leaves Chicago at 7:40 p.m., passes through Champion (about 6 a.m.) and arrives at Calumet at 9:15 a.m. It leaves Calumet at 4:45 p.m., returning via Champion, and arrives at Chiago at 6:50 a.m. The superintendent of the Superior division of the Milwaukee testified that the service ordered by the commission is an exact duplication of that rendered by the Copper Country Limited.
The Chippewa leaves Chicago at 12:30 p.m., arrives in Channing at 7:55 p.m., and continues to Ontonagon, arriving there at 10:50 p.m. It leaves Ontonagon at 11:10 a.m. and arrives at Chicago at 9:40 p.m. This train does not carry any sleeping cars and handles passengers from Iron River and Crystal Falls in both directions by bus.
The testimony shows that the commission's order is unreasonable, arbitrary, and confiscatory. The Milwaukee should not have this confiscatory order *299 that embodies duplicity of service and substantial loss of profits imposed upon it.
We recently had occasion to consider a confiscatory order in Chicago & North Western Railway Co. v. Public Service Commission, 329 Mich 432. In that case, involving an application for an order permitting discontinuance of railroad service, we quoted with approval the language of a 3-judge Federal court in Ann Arbor R. Co. v. Michigan Public Service Commission, 91 F Supp 668, where that court's observation was summarized in our headnote as follows:
"An order of a public service commission requiring a railroad to operate passenger trains at a substantial loss is arbitrary and unreasonable and carries with it the confiscation of the railroad company's property, where the furnishing of the service is obviously unnecessary and serves no useful purposes, notwithstanding the earnings from freight and other service might absorb the loss."
That rule is also applicable here. Because the commission is without jurisdiction and its order is unreasonable, arbitrary, and confiscatory, the decree of the circuit court is affirmed, with costs to appellee.
NORTH, C.J., and DETHMERS, CARR, SHARPE, BOYLES, and REID, JJ., concurred. BUTZEL, J., did not sit.