Donald Warden, Roger C. Holmes, San Francisco, Cal., for plaintiffs.

Michael I. Spiegel, Deputy Atty. Gen., State of California, San Francisco, Cal., for defendant.

Mark I. Schickman, San Francisco, Cal., Stewart H. Foreman, Shartsis, Friesi & Niesar, San Francisco, Cal., for amicus curiae.

**Donald WARDEN et al., Plaintiffs,**

v.

**Evelle J. YOUNGER, Attorney General of the State of California, Defendant.**

**No. C–76–2851 SC.**

United States District Court,
N. D. California.

Jan. 31, 1977.

## ORDER

CONTI, District Judge.

This matter is before the court on plaintiffs' motion for a preliminary injunction. Plaintiffs, a purported class of California business people, seek to restrain defendant from enforcing Sections 16721 and 16721.5 of the California Business and Professions Code (hereinafter referred to as "the Act"), pending the court's consideration of the Act's constitutionality. In response, defendant has filed a counter-motion to dismiss based on numerous grounds, including the doctrine of abstention. It is the doctrine of abstention that will prove dispositive of this case.

Sections 16721 and 16721.5, effective January 1, 1977, are additions to the Cartwright Act, California's antitrust law. California Business and Professions Code §§ 16700 et seq. Section 16721 provides that:

Recognizing that the California Constitution prohibits a person from being disqualified from entering or pursuing a business, profession, vocation, or employment because of sex, race, creed, color, or national or ethnic origin, and guarantees the free exercise and enjoyment of religion without discrimination or preference; and recognizing that these and other basic, fundamental constitutional principles are directly affected and denigrated by certain on-going practices in the business and commercial world, it is necessary that provisions protecting and enhancing a person's right to enter or pursue business and to freely exercise and enjoy religion, consistent with law, be established.

(a) No person within the jurisdiction of this state shall be excluded from a business transaction on the basis of a policy expressed in any document or writing and imposed by a third party where such policy requires discrimination against that person on the basis of the person's sex, race, color, religion, ancestry or national origin or on the basis that the person conducts or has conducted business in a particular location.

(b) No person within the jurisdiction of this state shall require another person to be excluded, or be required to exclude another person, from a business transaction on the basis of a policy expressed in any document or writing which requires discrimination against such other person on the basis of that person's sex, race, color, religion, ancestry or national origin or on the basis that the person conducts or has conducted business in a particular location.

(c) Any violation of any provision of this section is a conspiracy against trade.

(d) Nothing in this section shall be construed to prohibit any person, on this basis of his or her individual ideology or preferences, from doing business or refusing to do business with any other person consistent with law.

Section 16721.5 provides that:

It is an unlawful trust and an unlawful restraint of trade for any person to do the following:

(a) Grant or accept any letter of credit, or other document which evidences the transfer of funds or credit, or enter into any contract for the exchange of goods or services, where the letter of credit, contract, or other document contains any provision which requires any person to discriminate against or to certify that he, she, or it has not dealt with any other person on the basis of sex, race, color, religion, ancestry, or national origin, or on the basis of a person's lawful business associations.

(b) To refuse to grant or accept any letter of credit, or other document which evidences the transfer of funds or credit, or to refuse to enter into any contract for the exchange of goods or services, on the ground that it does not contain such a discriminatory provision or certification.

The provisions of this section shall not apply to any letter of credit, contract, or other document which contains any provision pertaining to a labor dispute or an unfair labor practice if the other provisions of such letter of credit, contract, or other document do not otherwise violate the provisions of this section.

For the purposes of this section, the prohibition against discrimination on the basis of a person's business associations shall be deemed not to include the requiring of association with particular employment or a particular group as a prerequisite to obtaining group rates or discounts on insurance, recreational activities, or other similar benefits.

For purposes of this section, "person" shall include, but not be limited to, individuals, firms, partnerships, associations, corporations, and governmental agencies.

Violation of the Act may be punished by fines up to $1 million for corporations and

$100,000 for individuals and/or up to three years in prison. Cal.Bus. & Prof.Code § 16755. Civil enforcement is authorized as well. Cal.Bus. & Prof.Code §§ 16754–16754.5.

Although plaintiffs contend that the Act has far reaching effect, it appears neutral on its face. The Act by its express terms is directed at discriminatory actions against persons, and, despite its position in the Cartwright Act dealing with trusts and re- straints of trade, it tracks closely the language of California's civil rights legislation, the Unruh Civil Rights Act. Cal.Civ.Code §§ 51, 52. The Act differs from the Unruh Act in that it is narrowly directed at discrimination in business transactions, while the Unruh Act is concerned generally with discrimination in public accommodations and business establishments.

Aside from its neutral appearance, plaintiffs contend that the California legislature passed the Act in response to the Arab nations' boycott against the nation of Israel. The Arab boycott actually takes three forms. In order to do business with an Arab country, a company must sign an agreement not to do business with Israel (primary boycott), any company on the Arab blacklist (secondary boycott), or any company that does business with any entity on the blacklist (tertiary boycott).

A primary boycott is simply a refusal on the part of one country to deal with another country to which it is hostile. That is, the Arab countries' refusal to deal with the nation of Israel. A secondary boycott is directed at persons outside Israel or the Arab countries. It amounts to a refusal by the Arab countries to deal with a business which does business with Israel. A tertiary boycott goes one step further and amounts to a refusal to deal with other businesses which do business in Israel, employ Jews or are controlled by Jews.

The Act being only recently effective, the California courts have not yet had an opportunity to interpret the legislation. Using the Arab boycott as a hypothetical situation, the Act's coverage is obviously subject to a wide range of interpretation. It could be interpreted very strictly or very broadly. Thus, the court is initially faced with an issue of state law—determining the proper construction of the challenged state enactment. It is not possible for the court to determine precisely what constitutional issue to decide without passing upon the state law construction issue first. Thus, without going further, the court must examine the doctrine of abstention which is applicable when a federal court is faced with a constitutional attack of a state statute where a preliminary issue is the construction of that statute.

*Railroad Commission v. Pullman,* 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941) is the seminal case explicating the abstention doctrine where the challenged state statute may be of uncertain application and has not been construed by state courts. The rationale for not allowing a federal court to adjudicate the constitutionality of such a state statute is that only state courts can make a firm determination regarding the meaning and effect of a state statute:

> "But no matter how seasoned the judgment of the district court may be, it cannot escape being a forecast rather than a determination . . . In this situation a federal court of equity is asked to decide an issue by making a tentative answer which may be displaced tomorrow by a state adjudication . . . The reign of law is hardly promoted if an unnecessary ruling of a federal court is thus supplanted by a controlling decision of a state court. The resources of equity are equal to an adjustment that will avoid the waste of a tentative decision as well as the friction of a premature constitutional adjudication." 312 U.S. at 499–500, 61 S.Ct. at 645.

As the Supreme Court has recently reaffirmed "[a]mong the cases that call most insistently for abstention are those in which the federal constitutional challenge turns on a state statute, the meaning of which is unclear under state law. If the state courts would be likely to construe the statute in a fashion that would avoid the need for a federal constitutional ruling or otherwise

significantly modify the federal claim, the argument for abstention is strong." *Harris County Commissioners Court v. Moore,* 420 U.S. 77, 84, 95 S.Ct. 870, 875, 43 L.Ed.2d 32 (1975). See also, *Colorado River Water Conservation District v. United States,* 424 U.S. 800, 813–814, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976). *Pullman* -type abstention must not be ordered, however, where it is clear that the statute is unconstitutional no matter how it may be construed by the state courts. See *Dombrowski v. Pfister,* 380 U.S. 479, 88 S.Ct. 1116, 14 L.Ed.2d 22 (1965). That is, when the challenged statute is unconstitutional on its face. As more fully established below the Act is not unconstitutional on its face as it is capable of a constitutional interpretation.

As stated above, the instant case presents the court with a state statute, the meaning of which is unclear and which is yet to be construed by the state courts. Although the Act on its face does not attempt to regulate interstate or foreign commerce, arguably such commerce could be reached if the Act were applied broadly. Plaintiffs argue that if the Act is so applied, it would violate the plenary power of the federal government to regulate interstate and foreign commerce. They rely heavily on *Bethlehem Steel Corp. v. Board of Commissioners,* 276 Cal.App. 221, 80 Cal.Rptr. 800 (1969). That case stands for the well established principle of constitutional law that as to matters of foreign affairs the power of the federal government "is *inherent, exclusive* and *plenary*." Id. at 224, 80 Cal.Rptr. 800. See also, *United States v. Pink,* 315 U.S. 203, 62 S.Ct. 552, 86 L.Ed. 796 (1942); *United States v. Belmont,* 301 U.S. 324, 57 S.Ct. 758, 81 L.Ed. 1134 (1936); *United States v. Curtiss-Wright Corp.,* 299 U.S. 304, 57 S.Ct. 216, 81 L.Ed. 255 (1936). However, not all state regulation of interstate or foreign commerce is forbidden in every instance. See e. g., *Buck v. California,* 343 U.S. 99, 72 S.Ct. 502, 96 L.Ed. 775 (1952). In at least one instance, a state's interest in protecting the civil rights of its citizens has been deemed so important that enforcement of the statute involved was permitted despite its effect on foreign commerce.

*Bob-Lo Excursion Co. v. Michigan,* 333 U.S. 28, 68 S.Ct. 358, 92 L.Ed. 455 (1949). The point is that even under a very broad construction there may be a certain set of facts under which the California courts could find the Act to be constitutional.

In lieu of a broad interpretation, California courts could determine that the statute is limited in scope to situations involving a California nexus for a questioned business activity, or that it applies only to intrastate transactions. It seems fair to say that if the Act is interpreted in such a manner it would be constitutional. Certainly, interpreting the Act in accord with the coverage of the Cartwright Act and the Unruh Civil Rights Act, it would take on a presumptively constitutional meaning.

There is evidence that the California courts will give the Act a narrow reading when faced with the issue of its construction. The California Attorney General has already interpreted the statute and considerably narrowed its coverage in answering specific questions posed to him. *Opinion of Attorney General,* No. SO 76/54, November 24, 1976. His opinion, while not controlling, is given great weight by California courts. *Carter v. Commission on Qualifications of Judicial Appointments,* 14 Cal.2d 179, 185, 93 P.2d 140 (1939). This notion must also be considered with the basic tenet of statutory construction that if the California courts are given the opportunity to construe the Act, it will be construed, if at all possible, in a manner which upholds its constitutionality. *State Board v. Thrift-D-Lux Cleaners, Inc.,* 40 Cal.2d 436, 442, 254 P.2d 29 (1953).

Since the Act by proper construction may take on a constitutional meaning, the first step is for the state court to decide the state law construction issue prior to the federal constitutional issue, because the latter issue will be dependent upon the resolution of the former. This procedure will best serve the interests of equity, comity and federalism. If the state courts adopt a constitutional construction, a federal constitutional issue will not be unnecessarily decided. Furthermore, if possible construc-

tions raise different constitutional issues, certain constitutional issues will not be unnecessarily decided. Additionally, the consequences are severe if the federal court decides to construe the state statute and does so erroneously. The court may erroneously construe the state statute to raise a constitutional question under which the statute is invalid, thereby striking down a state enactment which, if properly construed, would be constitutional. Or it may erroneously construe the state statute too narrowly in order to avoid the constitutional issue when a more liberal interpretation would be constitutional. In the latter situation, the court would be imposing unrequired conditions on the state statute. Of course, the seriousness of the consequences of an erroneous ruling vary relative to the degree of error in the determination of the state law issue.

To avoid error in the first instance, it is most proper for the federal court to abstain on the state law issue.

A further problem is presented by the fact that plaintiffs are attacking the constitutionality of the Act as it may be hypothetically applied. No persons have been subjected to prosecution under the Act. Plaintiffs' only claim of harm is that of allegedly threatened prosecution. However, plaintiffs do not point to a concrete set of facts under which prosecution is threatened. As set forth above, there is little doubt that the Act can be applied constitutionally. The Supreme Court has recently reaffirmed that abstention is appropriate when a state statute is challenged as applied, rather than upon its face, "since the reach of an uncertain state statute might, in that circumstance, be more susceptible of a limiting or clarifying construction that would avoid the federal constitutional question." *Steffel v. Thompson,* 415 U.S. 452, 474, n. 21, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974). *A fortiori,* abstention is more appropriate when a state statute is challenged as hypothetically applied.

The doctrine of abstention under the present circumstances, dictates that plaintiffs take the complaint filed in this case, and after minor modifications, file it in the state court, seeking the same relief they sought here. This will give the state court the opportunity to resolve the state law issue regarding construction of the Act.

For the above reasons, it is the order of the court that the court abstain from resolution of the instant case, and it is the further order of the court that the case be dismissed.