Titone, J.
(dissenting). I agree with the majority’s conclusion that the rational basis standard governs our review of the State action in this case. I also agree that maintaining balanced competition in the league is a legitimate State interest that may justify exclusion of certain nonpublic schools from its membership. However, unlike the majority, I cannot conclude *140 that the referendum vote instituted by Section VI here is a mechanism that furthers that legitimate interest. Rather, because the referendum vote operates to exclude schools without reference to any objective or observable criteria, this type of State action is patently arbitrary and cannot rationally further the proffered legitimate State interest. Accordingly, I dissent.
Initially, it is beyond dispute that the athletic league may lawfully treat nonpublic school applicants seeking admission to the league differently from public-school members based on rational distinctions between those two classifications (O’Connell High School v Virginia High School League, 581 F2d 81, 85 [4th Cir 1978]). As recognized by the majority, Section Vi’s State action — its employment of the challenged admissions criteria for nonpublic school applicants — "must be analyzed to determine whether it 'rationally furthers some legitimate, articulated state purpose’ ” to survive Walsh’s equal protection challenge (majority opn, at 136, quoting San Antonio School Dist. v Rodriguez, 411 US 1, 17 [emphasis added]).
Section Vi’s justifications for its special membership requirements for nonpublic schools that are credited by the majority include the desires to maintain fair competition and community spirit (see, majority opn, at 137). According to Section VI, the goals of reducing "competitive imbalances” and of maintaining community spirit "would be jeopardized by unlimited or unqualified membership admittance of private schools that are able to offer financial incentives and other differentiating admission incentives to their students.” (Id., at 137.) While that may well be true, the majority fails to explain how the referendum vote, as it currently operates, is a rational means of safeguarding against such feared competitive mismatching or decreased morale in the league. In other words, I cannot envision how the unqualified referendum vote reasonably ensures that student competitors of applicant nonpublic schools will be an appropriate or inappropriate match for the public schools already permitted to compete in Section VTs activities.
Indeed, no objective criteria circumscribe the discretion granted to the members participating in the referendum vote. For example, the league has not required that the voters consider such factors as whether the applicant schools had more advanced competitors because their athletic programs were more highly funded or because their students had spent *141 summers in professional training camps — considerations that might support Section Vi’s argument that a nexus exists between the goal sought to be achieved — fair competition — and the means instituted to achieve it — the referendum vote. However, as the voting mechanism currently stands, there is no possible way to know whether an applicant was excluded for a reason that would advance the stated goals or for some other discriminatory purpose. Further, the opportunity for mischief in this ballot exercise is apparent, since voting members may use that mechanism as a tool to further their own agendas, discriminatory or not. Accordingly, because the referendum vote bears no relationship to "level[ling the] playing field” in Section VI athletics (id., at 138), and in fact can be just as easily used to advance other, less favorable objectives, I cannot conclude that use of that criterion for league admission is a constitutionally acceptable State action (Louisiana High School Athletic Assn. v St. Augustine High School, 396 F2d 224, 228 [5th Cir 1968]; Matter of Friends Academy v Section VIII of N. Y. State Pub. High School Athletic Assn, 154 Misc 2d 1).
The majority reaches its contrary conclusion by misreading the holding of St. Augustine as one based on a suspect classification and strict-scrutiny analysis.* St. Augustine involved a class action brought on behalf of nonpublic schools who were able to join the Louisiana High School Athletic Association (LHSAA) — the public school athletic league — by meeting certain admission requirements, and only then by receiving two-thirds vote of the schools in the district in which it was to compete, and a similar vote of the general membership attending the Association’s annual meeting.
The District Court invalidated the two-thirds majority vote provision on the ground that it was an "arbitrary vote” (St. Augustine High School v Louisiana High School Athletic Assn., 270 F Supp 767, 776 [ED La 1967]), and that holding was af *142 firmed by the Fifth Circuit Court of Appeals (396 F2d 224). Importantly, that provision’s invalidation was not predicated on a threshold determination that any suspect classification had been created or injured by the challenged State action. To be sure, the District Court found that the proof pointed to the conclusion that racial discrimination formed the basis for the vote denying admission to St. Augustine (a school attended predominantly by African-Americans). However, its express holding was dependent solely upon the ground that "the voting requirement for LHSAA membership is an arbitrary and unreasonable method of making distinctions between applicants for membership, conducive to wholesale discrimination and arbitrary and capricious treatment of any and all candidates for membership in the LHSAA, and therefore is violative of the Fourteenth Amendment” (270 F Supp, at 777 [emphasis added]).
Employing an analysis that has compelling application here, the District Court in St. Augustine concluded that, "[Regardless of whatever other worth” the two-thirds majority vote may have had, one of its effects was that "the voting requirement provides the LHSAA with a painless and efficient method of denying membership to any high school it wishes without the embarrassing necessity of assigning a reason for the denial” (id., at 776). The court concluded that "[t]hat effect, the enhancement of the arbitrary power of the state in these matters, affects not only so-called 'Negro schools,’ but each and every high school of the State of Louisiana, including so-called 'white schools’ as well” (id., at 776). After noting that "[e]very school seeking membership must be faced with the prospect of securing the favorable vote of two-thirds of the members of the Association” (emphasis in original), the court asked: "What other state agency or association places such a burden on the citizens seeking its aid? Certainly the very thought of such an arbitrary vote by state officers or agents is abhorrent to the principles of the Fourteenth Amendment and every civil right of all the citizens of this country, Negro or white” (id., at 776 [emphasis added]).
Thus, St. Augustine stands for the sound proposition that when the basis for the State’s denial of a person’s participation in a State-promoted activity cannot be ascertained, that action is irrational, and, accordingly, not even the rational basis standard of review can be met. So too, here, the voting mechanism employed by Section VI is an inherently arbitrary procedure that cannot be trusted to further any legitimate State interest, *143 much less the stated one. The majority’s sanction of this tallied-vote system renders the grant of eligibility for membership in Section VI to nonpublic schools a hollow victory.
The referendum vote here is also decidedly different from the State action that survived equal protection challenge in Walsh v Louisiana High School Athletic Assn. (616 F2d 152 [5th Cir 1980]), which the majority cites as persuasive authority here. There can be no doubt that the transfer rule upheld in Walsh, which prevented transfer students from engaging in sports for a period of one year from the date of their transfer to a new high school, was rationally related to the legitimate goal of discouraging or eliminating recruitment tactics designed to entice promising athletes to transfer to a recruiting school. In the Fifth Circuit’s own words, the rule barring participation in athletics for one year upon transfer is "rationally and logically” related to that goal because it "imposes a direct cost on an identifiable event that must necessarily accompany that conduct. Moreover, by exacting its price in terms of a period of interscholastic athletic ineligibility, the transfer rule focuses its effect on athletic recruiting” (id., at 160 [emphasis added]). Rather than sending a similarly clear message to applicants that certain conduct will distinguish them from public schools for purposes of participation in the league and cause their application for membership in Section VI to be treated with disfavor, the referendum vote here can leave denied applicants with nothing more than bewilderment over the reasons for their rejection. Indeed, because applicants such as plaintiff can never know the basis for the denial of their applications, they cannot refashion their conduct' in a manner that will avoid future rejection.
Accordingly, I conclude that Walsh has met its burden of showing that the voting mechanism itself — the dispositive State action — is not founded on any identifiable criteria and thus cannot serve as a reasonable basis for distinguishing between public and nonpublic schools in a manner that furthers the stated goal of matched competition. Thus, this State action is inherently unreasonable and cannot satisfy even the rational basis standard of review (see, St. Augustine, supra). As forcefully stated by the District Court in St. Augustine:
"It is certainly probable that many of the schools which voted against St. Augustine did so for reasons other than race, without any thought of discrimination, and in complete good faith. And it *144 may be that the voting provision was inserted in the LHSAA Constitution for the purpose of allowing the member schools to investigate various aspects of a candidate for membership and to cast votes based on valid and reasonable criteria for membership * * *.
"However, the latter possibility is surely no excuse for vesting such broad and arbitrary power in an association acting essentially for the state. Where such wide discretion is the ready vehicle for a covert system of discrimination, the practice must be held in and of itself violative not only of the equal protection clause, but of the basic due process guarantees of the Constitution. In this case * * * there is simply no way of ascertaining positively why St. Augustine was refused membership in the LHSAA by a vote of 185 to 11. The very fact of that impossibility is the best reason and rationale for prohibiting such subtleties as this voting provision from interfering with the very important rights of all citizens to the equal protection of the laws. We need not call the 196 school principals who voted on the issue to testify in order to determine whether 120 of them voted against St. Augustine for racial reasons. We simply rule that no school which meets the express and objective qualifications for membership in LHSAA may be denied admission on the basis of an arbitrary vote of the members. The state simply may not employ practices which leave such a large amount of discretion in the hands of state officials, at least in circumstances and situations where definite standards may easily be fixed without sacrificing fair and efficient administration.” (St. Augustine, 270 F Supp, at 776-777, supra [emphasis added].)
To my knowledge, no such arbitrary voting mechanism used to distinguish among participants in a State-promoted activity has ever survived an equal protection challenge, and I am convinced that the referendum vote employed here should suffer the same fate. Accordingly, I respectfully dissent, and vote to reverse the order granting summary judgment to defendants, and grant the summary judgment motion in favor of plaintiffs, declaring that the Section VI referendum vote is unconstitutional.
*145 Chief Judge Kaye and Judges Simons, Smith, Levine and Ciparick concur with Judge Bellacosa; Judge Titone dissents in a separate opinion.
Order affirmed, with costs.

 The majority’s misreading of St. Augustine as a "strict scrutiny” case also led it to disregard Archbishop Walsh’s citation to Matter of Friends Academy v Section VIII of N. Y. State Pub. High School Athletic Assn. (154 Misc 2d 1, supra), which invalidated a similar referendum vote on equal protection grounds in reliance on St. Augustine. The court in Friends not only expressly adopted the rational basis test and declined to employ strict scrutiny analysis, but also correctly noted that the court in St. Augustine had rested its holding not on strict scrutiny analysis, but on the ground that such an arbitrary voting provision was abhorrent to the very principles underlying and protections afforded to every citizen by the Fourteenth Amendment (154 Misc 2d 1, 11).