OPINION OF THE COURT
Marvin E. Segal, J.
The petitioner is a not-for-profit educational corporation, which operates a nonpublic secondary school for boys and girls in Locust Valley, New York. Petitioner was established in 1876, incorporated by the Regents of the University of the State of New York in 1898, and is presently fully accredited by the State of New York. Petitioner is a member of the Friends Council of Education and its corporate bylaws require at least half of its trustees to be members of the Religious Society of Friends.
The New York State Public High School Athletic Association, Inc. (NYSPHSAA) is a not-for-profit corporation organized to provide a central association through which secondary school students in New York may compete in interscholastic athletic activities. The corporation is administered by a central committee consisting of representatives from each of 11 geographic areas known as sections. The respondent herein, Section VIII, is a section of this parent organization, created pursuant to the NYSPHSAA constitution, and bound, by its own constitution, to the bylaws, rules, regulations and constitution adopted by the NYSPHSAA.
Article I of the NYSPHSAA constitution lists the purposes for which the association was organized, in part, as follows:
*3 "3. To encourage all forms of interschool athletic activities for all boys and girls in grades 7-12 as an integral part of the education program.
"4. To adopt, strengthen, interpret, and enforce uniform eligibility, rules, and sports standards governing participation of interschool athletics at all levels as established in the Regulations of the Commissioner of Education governing athletics.”
Article I further sets forth that "non-public schools may petition and be accepted for full membership” in the association. Article II entitled "Membership” provides in paragraph (f) that "[a]pproved 'Friends and Neighbor Schools’ may become members of the NYSPHSAA, Inc., by payment of the annual fee, provided the member schools in any section and the State Executive Committee vote to authorize those schools making application.” The petitioner is a member of the New York State Independent School Athletic Association, one of the associations belonging to the New York State Federation of State High School Athletic Associations, and as such is an approved "Friends and Neighbors” school.
The admission procedures adopted by the respondent regarding nonpublic schools are as follows:
"1.1 A properly completed application must be received by the Executive Director by October 1 of the preceding year in which participation is expected. The Executive Director will forward said application to the Admissions Review Committee for action. An invitation will be extended to the applying school to attend that meeting for the purpose of making a presentation.
"1.2 The Admissions Review Committee will then refer their findings and recommendations to the League at their November meeting. The applying school may make a presentation.
"1.3 The application will be discussed at the November meeting of the Athletic Council. The applying school may make a presentation.
"1.4 The application will be voted upon by the member schools by a referendum post card ballot distributed by the office of the Executive Director.
"1.5 The applying school will be notified of the results.”
On or about March 21, 1991, the petitioner submitted an application for membership in the respondent association. On June 3, 1991, the petitioner attended a meeting of the respon *4 dent’s Admissions Review Committee and made a presentation. Said Committee reviewed the petitioner’s financial aid program and over-all operation, and recommended that petitioner be admitted to membership. The minutes of respondent’s Athletic Council Meeting held on September 30, 1991, reflect, in relevant part, that the "Committee was very impressed with the overall operation of the school”. On November 19, 1991, the petitioner made a presentation to the respondent’s members and on November 25, 1991, made a presentation to the Athletic Council. The Athletic Council called for a referendum postcard vote. On February 13, 1992, the office of the Executive Director of the respondent mailed ballots, for a referendum vote, on petitioner’s application for membership, to respondent’s members. Sometime during the week of February 24, 1992, said office realized that only one ballot had been sent to multiple school districts. On or about February 25, 1992, the proper number of ballots were mailed to each district. The ballots indicated that they should be returned to the Executive Director on or before March 2, 1992. This date was selected by respondent’s Executive Director, Bernie O’Brien, to accommodate the petitioner, to enable the petitioner to take steps to seek application in another association in the event of a rejection of its application to the respondent. As of the morning of March 2, 1992, only 38 out of 57 member schools had returned ballots to the office of the Executive Director.
Apparently, a majority of these 38 ballots voted to accept petitioner as a member of the respondent association. On the morning of March 2, 1992, the president of the respondent, Santo Barbarino, was contacted by the office of the Executive Director, and was advised that 19 schools had not returned their ballots.
After speaking with petitioner’s athletic director, and after determining that schools had been closed between February 15th and February 23rd, and that many superintendents had been at a convention in California until February 26, 1992, Mr. Barbarino determined that the time for the submission of ballots should be extended to March 3, 1992. He telephoned three other members of the Executive Committee who voted, as a majority of the Executive Committee, to extend the deadline for the submission of ballots to March 3, 1992, at 4:30 P.M.
The secretary of the Executive Director was directed to telephone the 19 members who had not responded to advise *5 them that they had until March 3, 1992, to submit their ballots. Upon making these calls, the secretary, Rosemarie F. Lynaugh, was informed that "a number” of schools had not received ballots. She faxed ballots to those schools and signed ballots were faxed back to the office of the Executive Director. The affidavit submitted by Ms. Lynaugh states that no tally was taken at the close of business on March 2, 1992. As of March 3, 1992, at 4:30 p.m., all members had mailed or faxed ballots to the office of the Executive Director. The petitioner was rejected for membership by a vote of 29 to 28.
On March 22, 1992, respondent’s Athletic Council voted for a revote. According to the affidavit of Robert Parry, the Chairman of the Superintendents’ Board for the respondent association, the Athletic Council approved a revote after much discussion concerning the referendum procedure, the legality of the deadline extension and the fact that the results of a partial tally had been revealed while member schools were still casting their votes. New ballots were prepared and mailed out on March 26, 1992, with a deadline of April 10, 1992, at 4:30 p.m. The result of this referendum was 28 votes for acceptance, 28 for rejection, with one school not voting. As a majority did not vote for acceptance, petitioner was denied membership in the respondent association.
The petitioner had belonged to the Island Football Conference, a league consisting of 13 public and private secondary schools in Nassau and Suffolk Counties, since 1980. In 1992, the respondent ruled that all its members must participate in respondent’s leagues. This caused respondent’s members to withdraw from the Island Football Conference. As a result of the withdrawals, the Island Football Conference was discontinued. The petitioner alleges that the demise of the Island Football Conference left petitioner with no access to league football competition except through membership with the respondent; that membership in a suitable football league is necessary to enable petitioner to provide its students with a well-rounded athletic program and enable them to compete successfully for favorable recognition from colleges, for both admission and financial aid; that petitioner’s inability to afford its students the opportunity to compete in interscholastic football will impose a serious detriment to petitioner’s ability to attract students, and maintain alumni interest and financial support.
The petitioner further contends that the rejection of its application for membership is contrary to the purpose for *6 which the respondent was created, and is contrary to the public policy set forth in Education Law § 559 (1) which provides in part that a "diverse alternative to public education is not only desirable but indeed vital to a state and nation”.
The petitioner applied for and was denied membership in the Fairchester Connecticut League. Said league has agreed to permit petitioner to schedule nonleague varsity football games with its members. Fairchester, however, offers no junior varsity football. Further, absent league membership, the independent varsity games petitioner does play will not be afforded league standing necessary to obtain a league rating.
By order to show cause and petition verified on May 21, 1992, the petitioner commenced the instant action seeking a judgment (1) declaring that it is a member of the respondent association by reason of the majority of favorable votes received by the office of the Executive Director as of the morning of March 2, 1992, and (2) annulling the votes of March 3, 1992, and April 10, 1992, which denied petitioner’s application for membership, on the grounds that said deadline extension and revote were "without lawful authority, ineffective and void.” The petitioner contends that: (1) it was admitted to membership by the valid votes as received on March 2, 1992; (2) the extension of the deadline to March 3, 1992, by telephone call was invalid; and (3) the denial of petitioner’s application to membership was arbitrary and capricious and without rational basis.
The actions, internal affairs, proceedings, rules and orders of a high school athletic association are subject to judicial scrutiny only to the extent that there is evidence that the acts complained of were arbitrary, capricious or an abuse of discretion, violative of the applicable constitutions, bylaws, rules or regulations. (Section VI of N. Y. State Pub. High School Athletic Assn. v New York State Pub. High School Athletic Assn., 134 AD2d 819, 820; Matter of Caso v New York State Pub. High School Athletic Assn., 78 AD2d 41; see also, Tedeschi v Wagner Coll., 49 NY2d 652; Matter of Olsson v Board of Higher Educ., 49 NY2d 408; Matter of Eastern N. Y. Youth Soccer Assn. v New York State Pub. High School Athletic Assn., 67 NY2d 665; Robin v New York State Pub. High School Athletic Assn., 71 AD2d 1009; Pratt v New York State Pub. High School Athletic Assn., 133 Misc 2d 679.) The test is whether there is a rational basis for the respondent’s actions. Actions are not arbitrary and capricious if they have a sound *7 basis in reason and a foundation of fact. (Matter of Pell v Board of Educ., 34 NY2d 222; Matter of Colton v Berman, 21 NY2d 322; Matter of Caso v New York State Pub. High School Athletic Assn., supra; Pratt v New York State Pub. High School Athletic Assn., supra.)
Based upon the facts that: (1) ballots were mailed on February 13, 1992; (2) multiple school district ballots were mailed on or about February 25, 1992; (3) schools were closed from February 15, 1992 through February 23, 1992; (4) a number of school superintendents were at a conference in California until February 26, 1992; (5) some schools apparently never received ballots; and (6) only 38 of 57 schools responded by mail as of the morning of March 2, 1992, it was neither arbitrary, capricious nor an abuse of discretion for a majority of the Executive Committee to extend the vote deadline by one day and to direct that calls be made by the office of the Executive Director reminding member schools to vote. The original vote deadline was set by the Executive Director to accommodate petitioner and is not governed by any specific rules or bylaws. Nothing in the relevant constitutions prohibits an extension of a referendum deadline and under the circumstances set forth above, the Executive Committee acted within its discretion in extending the deadline by 24 hours. Further, the procedures complained of by the petitioner including the telephone vote of the Executive Committee and the acceptance of fax ballots, were reasonable under the circumstances and were not arbitrary, capricious or an abuse of discretion.
Further, even if some act by the respondent was deemed to be ultra vires thereby tainting the March 3, 1992 vote, the remedy to which petitioner would be entitled would be a revote. A revote was conducted on April 10, 1992, based on respondent’s own concerns about the propriety of the March 3, 1992 vote.
In summary, the court finds that the Executive Committee acted reasonably and within the scope of its authority in extending the original vote deadline to March 3, 1992; and that the votes of March 3, 1992 and April 10, 1992, denied petitioner’s application for membership. Accordingly, to the extent that petitioner’s application seeks judgment declaring that it is a member of the respondent association pursuant to the vote tally on the morning of March 2, 1992, petitioner’s application is denied.
*8 The court finds, however, that the referendum vote required by the respondent’s bylaws, as a prerequisite to admission of a nonpublic school to the respondent association, is violative of petitioner’s right to equal protection guaranteed by the Fourteenth Amendment of the Constitution of the United States.
The law is well settled that athletic associations such as the respondent herein are "so intertwined with the state” that the actions taken by the association are considered State action. (Clark v Arizona Interscholastic Assn., 695 F2d 1126, 1128, cert denied 464 US 818; see also, Yellow Springs Bd. of Educ. v Ohio High School Athletic Assn., 647 F2d 651; Brenden v Independent School Dist. 742, 477 F2d 1292; Mitchell v Louisiana High School Athletic Assn., 430 F2d 1155; St. Augustine High School v Louisiana High School Athletic Assn., 270 F Supp 767, affd 396 F2d 224; Barnhorst v Missouri State High School Activities Assn., 504 F Supp 449; Gilpin v Kansas State High School Activities Assn., 377 F Supp 1233; Baltic Ind. School Dist. No. 115 v South Dakota High School Activities Assn., 362 F Supp 780.) Accordingly, the actions of the respondent must comply with the equal protection rights afforded by the Fourteenth Amendment.
Education is not a fundamental right under our Constitution. (San Antonio Ind. School Dist. v Rodriguez, 411 US 1; O’Connell High School v Virginia High School League, 581 F2d 81.) Participation in interscholastic athletics is a privilege and is not a constitutionally secured right. (Mitchell v Louisiana High School Athletic Assn., 430 F2d 1155, supra; O’Connell High School v Virginia High School League, supra.) The right to equal protection guaranteed by the Fourteenth Amendment of the Constitution is, however, a fundamental right. (Clark v Arizona Interscholastic Assn., supra; O’Connell High School v Virginia High School League, supra; St. Augustine High School v Louisiana High School Athletic Assn., supra; Wittkamper v Harvey, 188 F Supp 715.) In the instant action, the petitioner does not seek to enforce any "right” to membership in the respondent association. Rather, it seeks to enforce its right to equal protection under the law, which is a right, in itself, independent of any right to participate in interscholastic athletics (see, Wittkamper v Harvey, supra, at 720).
The petitioner argues that based upon its affiliation with the Religious Society of Friends, the "unequal treatment” of its application for membership affects the "fundamental right” to freedom of religion, constituting a "suspect classifica *9 tian” which may be upheld only when the "unequal treatment” promotes a compelling State interest. Petitioner has, however, presented no evidence of any religious discrimination, nor is such a finding necessary to the disposition of the action.
Even where no fundamental right or suspect classification is involved, citizens are entitled to equal protection under the law. (Wittkamper v Harvey, supra, at 720.) Nonpublic school students have the right under the Fourteenth Amendment to be treated in the same manner as public school students with regard to participation in interscholastic athletics, absent some rational basis for treating the two classes of students differently. (O’Connell High School v Virginia High School League, supra, at 84.) Where there is no fundamental right or suspect classification involved, the test to determine the validity of State action is whether the "unequal treatment” bears some rational relationship to a legitimate State purpose. (San Antonio Ind. School Dist. v Rodriguez, supra; Weber v Aetna Cas. & Sur. Co., 406 US 164.) A classification must be reasonable, and not arbitrary, and must rest upon some ground of difference having a fair and substantial relation to the object of the State action, so that all persons similarly circumstanced shall be treated alike. (Reed v Reed, 404 US 71; Royster Guano Co. v Virginia, 253 US 412; Baltic Ind. School Dist. No. 115 v South Dakota High School Activities Assn., supra.)
The petitioner herein is entitled to "equal treatment” in two contexts. First, its students are entitled to be treated in the same manner as public school students, in regard to participation in interscholastic athletics, absent a rational, legitimate State purpose for treating the two classes of students differently. Second, petitioner is entitled to be treated in the same manner as other nonpublic schools which apply for admission to the respondent association, absent a rational and legitimate basis for disparate treatment.
Any public secondary school in Nassau County, which is a member in good standing of the New York State Public High School Athletic Association, Inc., is automatically a member of the respondent association pursuant to article III of the respondent’s constitution. Nonpublic schools must meet certain criteria for membership and must receive a majority of favorable votes from the members of the association. Both sides herein concede that the petitioner met all the prerequisites for admission and received a favorable recommendation from respondent’s Admissions Committee. Petitioner was denied *10 membership solely on the ground that it was unable to obtain a majority of votes in favor of its admission.
The respondent has not advanced any rational or legitimate State interest which is served by the "unequal treatment” of public and nonpublic schools, to wit: the automatic admission of public schools and the admission of nonpublic schools only upon a majority vote in favor of admission. Further, the vote, which is made without any objective criteria or standards, renders it impossible to gouge whether or not respondent’s admission procedures afford all nonpublic schools the equal treatment under the law to which they are entitled by the Fourteenth Amendment. As explained by the United States District Court of the Middle District of Georgia, Americas Division, in Wittkamper v Harvey (supra, at 721), an educational agency, such as the respondent herein, may set reasonable standards for admission, which are rationally related to a legitimate State purpose, but it may not deny membership arbitrarily, "for 'any reason or for no reason’ ”.
As the membership admission referendum herein, devoid of objective criteria or standards, permits State action arbitrarily denying membership to nonpublic school students, "for any reason, or for no reason”, denial of membership to the petitioner based solely upon the tally of said referendum, constitutes a denial of petitioner’s right to equal protection.
In St. Augustine High School v Louisiana High School Athletic Assn. (supra, at 776), the United States District Court, Eastern District of Louisiana, affirmed by the 5th Circuit Court of Appeals (396 F2d 224, supra), held that a referendum vote, which denied a nonpublic school admission to an athletic association, constituted a denial of the nonpublic school’s constitutional right to equal protection based upon the following reasoning:
"[T]he voting requirement provides the [Louisiana High School Athletic Association] with a painless and efficient method of denying membership to any high school it wishes without the embarrassing necessity of assigning a reason for the denial. Regardless of whatever other worth the voting provision may have, that is certainly one of its effects. That effect, the enhancement of the arbitrary power of the state in these matters, effects not only so called 'Negro schools’ but each and every high school in the State of Louisiana, including so called 'white schools’ as well. Every school seeking membership must be faced with the prospect of securing the *11 favorable vote of two-thirds of the members of the Association. What other state agency or association places such a burden on the citizens seeking its aid? Certainly the very thought of such an arbitrary vote by state officers or agents is abhorrent to the principles of the Fourteenth Amendment and every civil right of all the citizens of this country, Negro or white.
"It is certainly probable that many of the schools which voted against St. Augustine did so for reasons other than * * * discrimination, and in complete good faith. And it may be that the voting provision was inserted in the LHSAA Constitution for the purpose of allowing the member schools to investigate various aspects of a candidate for membership and to cast votes based on valid and reasonable criteria for membership * * * and [there] may be * * * some valid purpose in allowing the Association to apply that standard, or some other reasonable and valid membership requirement not expressly set forth in the Constitution or By-laws of the Association.
"However, the latter possibility is surely no excuse for vesting such broad and arbitrary power in an association acting essentially for the state * * * [The impossibility] of ascertaining positively why St. Augustine was refused membership * * * is the best reason and rationale for prohibiting such subtleties as this voting provision from interfering with the very important rights of all citizens to equal protection of the laws * * * The state simply may not employ practices which leave such a large amount of discretion in the hands of state officials, at least in circumstances and situations where definite standards may be fixed easily without sacrificing fair and efficient administration.”
Although the facts in the St Augustine High School case (supra) clearly involved concerns of racial discrimination, the court did not afford relief to the nonpublic school on the basis that the racial composition of the school created a suspect classification which could be afforded unequal treatment only to effectuate a compelling State interest. The court applied the rationality standard rather than the compelling State interest standard and held that all nonpublic school students are entitled to equal treatment with public school students with regard to participation in interscholastic athletics. The court further held that a discretionary referendum vote devoid of standards, constitutes a constitutionally impermissible denial of equal protection in that such a vote renders it impossible to determine whether the denial of an application for admission *12 is arbitrary or is based upon some valid and reasonable criteria.
The rationale adopted by the court in St. Augustine High School v Louisiana High School Athletic Assn. (supra) is dispositive of the instant action. The referendum vote requirement set forth in respondent’s bylaws, as a prerequisite to membership, permits the respondent to deny a nonpublic school, with or without religious affiliation, membership for "any reason, or for no reason”, upon grounds which are not set forth and are therefore not subject to review.
The public policy of this State recognizes that the vitality of our pluralistic society is fostered by the healthy competitive and diverse alternative to public education which is provided by nonpublic schools. (Education Law § 559.) The very purpose for which the NYSPHSAA was created, according to its own constitution is to encourage all forms of interschool athletic activities for all boys and girls in grades 7-12 as an integral part of the education program.
In view of this public policy, the denial of membership to petitioner in the respondent association, based upon referendum postcard ballot of the member schools, despite the fact that petitioner met all other criteria for admission, was arbitrary, capricious, and constituted a constitutionally impermissible denial of petitioner’s right to equal protection under the law.
Accordingly, the petitioner is entitled to judgment declaring it to be a member of the respondent association, with all rights and privileges of membership, upon payment of any requisite membership fees.