88 N.Y.2d 131 (1996)
666 N.E.2d 521
643 N.Y.S.2d 928
Archbishop Walsh High School, Appellant,
v.
Section VI of the New York State Public High School Athletic Association, Inc., Respondent.
Court of Appeals of the State of New York.
Argued February 15, 1996.
Decided April 2, 1996.
Dwyer & Black, P. C., Olean (Joseph C. Dwyer of counsel), for appellant.
Magavern, Magavern & Grimm, L.L.P., Buffalo (James L. Magavern and Robin J. Chapman of counsel), for respondent.
Chief Judge KAYE and Judges SIMONS, SMITH, LEVINE and CIPARICK concur with Judge BELLACOSA; Judge TITONE dissents in a separate opinion.
*134 BELLACOSA, J.
The sole issue on this appeal is whether the denial to appellant Archbishop Walsh High School of membership in Section VI of the New York State Public High School Athletic Association, Inc. constitutes a deprivation of appellant's right to equal protection of the law under the Fourteenth Amendment of the United States Constitution. Both courts below found no such violation, and Walsh appeals to this Court as of right on constitutional grounds (CPLR 5601 [b] [1]). In particular, Walsh claims that Section VI failed to accord it equal protection of laws when Section VI denied Walsh membership in the Athletic Association based on an insufficient number of favorable votes in a member referendum on Walsh's application. The voting mechanism is the culminating step of the qualifications imposed on all nonpublic school applicants for membership and the essential feature of appellant's constitutional challenge.
*135 The Archbishop Walsh High School, located in Cattaraugus County, New York, is a member of that county's High School Athletic Association, one of the leagues sanctioned and regulated by Section VI. Section VI is the overarching, independent, not-for-profit corporation affiliated with the New York State Public High School Athletic Association. The State Association is also a not-for-profit corporation organized under the aegis of the New York State Commissioner of Education (see, 8 NYCRR part 135) to provide an umbrella organization under which secondary schools may operate and coordinate their interscholastic athletic programs. Section VI currently has a membership of 93 public schools located in the eight western counties of New York State. No nonpublic school has ever been granted membership in Section VI.
In August 1993, Walsh applied for Section VI membership. At that time, the Section VI constitution did not provide for the admission of nonpublic schools, but did recognize a category of "friends and neighbors" schools. Walsh's application to Section VI was accepted under that special category and it met the pertinent special admission procedures, including the submission of a completed application and a presentation to the Section VI Athletic Council. Ultimately, Walsh failed to obtain approval by a majority of votes from Section VI's member schools, and for that reason alone its application was denied. It should be emphasized that this is a quite ordinary majority ballot system among membership organizations. To the extent that it is at all relevant in an equal protection calculus, as contrasted to a due process assessment not properly raised in this case, the voting procedure on this record is neither secret nor some single or block vote exclusionary subterfuge.
Walsh's declaratory judgment action rests solely on a claimed deprivation of its right to equal protection under the Fourteenth Amendment of the United States Constitution. Upon the parties' respective motion and cross motion for summary judgment, Supreme Court granted Section VI's motion for summary judgment and dismissed the complaint. The Appellate Division technically modified the judgment by converting it into a declaration that Section VI's referendum requirement did not deprive Walsh of equal protection of the law. We agree and affirm the order.
Preliminarily, everyone agrees that the actions of Section VI constitute State action, and Section VI must, therefore, comply with applicable equal protection standards and not *136 deny Walsh its rights in that regard (see, Matter of Eastern N. Y. Youth Soccer Assn. v New York State Pub. High School Athletic Assn., 67 N.Y.2d 665, 667; 8 NYCRR part 135; see also, Matter of Caso v New York State Pub. High School Athletic Assn., 78 AD2d 41, 46; Clark v Arizona Interscholastic Assn., 695 F.2d 1126, 1128, cert denied 464 US 818). The disposition of this case turns on the standard of judicial review applicable to the controversy. We are unanimous that the rational basis standard governs and all but one of us conclude that the standard is satisfied in this case.
Although education, and by related extension participation in a publicly sponsored and supported interscholastic sports association, is not in and of itself a fundamental substantive right under the Constitution (Albach v Odle, 531 F.2d 983, 984-985), the right to equal protection of the laws is fundamental and explicitly safeguarded (San Antonio School Dist. v Rodriguez, 411 US 1, reh denied 411 US 959; O'Connell High School v Virginia High School League, 581 F.2d 81, 84, cert denied 440 US 936). Absent an allegation of discrimination based on a suspect classification elevating judicial review beyond the rational basis standard, Section VI's State action must be analyzed to determine whether it "rationally furthers some legitimate, articulated state purpose and therefore does not constitute an invidious discrimination in violation of the Equal Protection Clause of the Fourteenth Amendment" (San Antonio School Dist. v Rodriguez, supra, at 17; see, Heller v Doe, 509 US 312, 318-321). Under this rational basis standard, no deprivation of equal protection of the law occurs so long as there is a plausible reason for the nonsuspect classification of the aggrieved complainant (Federal Communications Commn. v Beach Communications, 508 US 307, 313-314; Nordlinger v Hahn, 505 US 1, 11).
Walsh would have the courts apply the higher "strict scrutiny" standard to its claim because, it argues, as a Catholic high school it fits within a suspect classification that qualifies for protection under a heightened standard of judicial review. No equal protection deprivation as among nonpublic schools is alleged or involved in this case. Walsh's narrowly targeted argument is untenable because the unequal treatment of which it complains is discrimination between public and nonpublic schools, not anything of a religious nature and not even anything within the entire class of nonpublic schools (cf., Matter of Di Maggio v Brown, 19 N.Y.2d 283, 290, citing Oyler v Boles, 368 US 448, 456).
*137 Notably, Walsh's due process claim  that the membership referendum is a "secret ballot" that is inherently biased against schools like Walsh  is unpreserved. Thus, the legal implications of any belated due process complaint cannot be considered, nor may we even address the accuracy of the asserted factual underpinnings of the theory.
The precise focus of this case and appeal is an examination on this record to determine whether Section VI's admission requirements for nonpublic schools reflect a rational basis related to the purposes of the organization sufficient to survive Walsh's equal protection challenge. Because Section VI's denial of membership to Walsh was predicated on the lack of a favorable majority of member votes, Walsh's discrimination claim must be resolved solely on the rationality of Section VI's ballot requirement. Walsh and the dissent acknowledge that Section VI has no constitutional obligation to open its membership to anyone other than public schools in the first instance. The argument is then, nevertheless, cast that once Section VI opens its membership opportunity to others, it cannot rationally justify the members' vote prerequisite for all nonpublic schools, while allowing automatic membership for all public schools.
Section VI, on the other hand, advances a number of concrete justifications for using specific membership qualifications for nonpublic schools, including an open membership ballot based on a majority vote. It states that because it is a voluntary organization of only public schools that necessarily have open community enrollment, it has an interest in the "character of competition that such community identity and non-selectivity engender" among member schools. This goal would be jeopardized by unlimited or unqualified membership admittance of private schools that are able to offer financial incentives and other differentiating admission incentives to their students. Section VI argues that this distinctive feature could cause competitive imbalances among schools, since public schools could not offer such benefits.
Section VI also points to the fact that, unlike public schools, nonpublic schools can draw students from a wider geographic area and, thus, skew the fair athletic balance among schools and regions. The diminution of community spirit among public schools  possibly resulting from the loss of identity that public schools usually enjoy through traditional community-based rivalries, especially in competitions such as championships  is part of the justification for membership criteria imposed on nonpublic school applicants that wish to enroll in Section VI. *138 There is no absolute ban, nor is there automatic entry. Rather, the screening process includes a membership vote applicable to all nonpublic school applicants as a method to deal with Section VI's legitimate concerns. The dissent raises the spectre of per se invidious and arbitrary discrimination by the mere use of an open, majority ballot system. It thus rejects as spurious the most elemental hallmark of the democratic process and one of associative groups  a majority vote  and ignores the plaintiff's burden on this kind of constitutional attack of showing that the requirement has no rational basis.
We, on the other hand, agree with the courts below that Section VI's reasons sufficiently identify and demonstrate a rational basis for its special membership requirements. The constitutions of both Section VI and the State Association reflect that the primary purpose of these organizations is to provide a "central association through which public secondary schools * * * may cooperate" in organizing interscholastic athletic activities (emphasis added). Section VI's membership qualifications for nonpublic schools are consistent with and further the identified purposes by reasonably assuring that all member schools have the opportunity to compete on a relatively level playing field. Walsh and the dissent rely on conclusory speculation and fail to show that the justifications advanced by Section VI in response to this equal protection claim are not reasonably related to the concerns of promoting rationally rooted interscholastic athletic competition. Courts may not skeptically second-guess these proffered reasons in equal protection constitutional analysis and simply declare such a voting mechanism per se arbitrary and unconstitutional.
Moreover, the issues and concerns tendered by Section VI for promulgating its special admission requirements as to all nonpublic school members find some additional support in the determinations of other courts. Appropriate justifications designed to minimize or mitigate uneven or undesirable competition between public and nonpublic schools, especially as affected by the differentiating recruitment opportunities geared towards student athletes, have been upheld (see, O'Connell High School v Virginia High School League, 581 F.2d 81, 85, supra; see also, Walsh v Louisiana High School Athletic Assn., 616 F.2d 152, 160, cert denied 449 US 1124). In the Virginia High School League case, for example, the Court of Appeals for the Fourth Circuit found a rational basis for a public high school athletic association's exclusion of all nonpublic schools, based on reasons similar to those advanced by Section VI here (581 F2d, at 87, supra).
*139 On the other hand, Walsh's and the dissent's extended reliance on nisi prius rulings in Matter of Friends Academy v Section VIII of N. Y. State Pub. High School Athletic Assn. (154 Misc 2d 1) and St. Augustine High School v Louisiana High School Athletic Assn. (270 F Supp 767, affd 396 F.2d 224), even if they were binding at this level, is seriously misplaced and flawed. The trial court in Friends Academy, while articulating and ruling on a rational basis analysis, also referenced the St. Augustine case as support for its conclusion on a rational basis characterization. No matter how ambiguous the District Court's description and analysis are in St. Augustine concerning the proper judicial review to be applied, the Fifth Circuit decided the case unequivocally as a preclusion from membership on racial grounds (St. Augustine High School v Louisiana High School Athletic Assn., 270 F Supp 767, affd 396 F.2d 224, 228, supra). Because St. Augustine was thus unquestionably and ultimately rooted in a race-based equal protection challenge at the strict scrutiny level, the nisi prius precedents advanced in support of appellant's argument in this respect fail and lack any persuasive value for the proper disposition of this case.
In sum, Section VI's membership voting requirement for the enrollment of nonpublic schools is a rational screening process on its face, addressed to the particular concerns and issues affecting its otherwise exclusively public schools' membership roster. Finally, nothing in this record supports the assertion or speculation that this voting procedure is intrinsically arbitrary or a subterfuge masking invidious discrimination that would offend the safeguards of the equal protection of the laws of this land. Such factors would present an entirely different case and constitutional theory. Since that is not this record and this case, and because appellant Walsh has failed to show its entitlement to a declaration of unconstitutionality, we conclude that the referendum requirement of Section VI does not deprive appellant Walsh of equal protection of the laws.
Accordingly, the order of the Appellate Division should be affirmed, with costs.
TITONE, J. (dissenting).
I agree with the majority's conclusion that the rational basis standard governs our review of the State action in this case. I also agree that maintaining balanced competition in the league is a legitimate State interest that may justify exclusion of certain nonpublic schools from its membership. However, unlike the majority, I cannot conclude *140 that the referendum vote instituted by Section VI here is a mechanism that furthers that legitimate interest. Rather, because the referendum vote operates to exclude schools without reference to any objective or observable criteria, this type of State action is patently arbitrary and cannot rationally further the proffered legitimate State interest. Accordingly, I dissent.
Initially, it is beyond dispute that the athletic league may lawfully treat nonpublic school applicants seeking admission to the league differently from public-school members based on rational distinctions between those two classifications (O'Connell High School v Virginia High School League, 581 F.2d 81, 85 [4th Cir 1978]). As recognized by the majority, Section VI's State action  its employment of the challenged admissions criteria for nonpublic school applicants  "must be analyzed to determine whether it `rationally furthers some legitimate, articulated state purpose'" to survive Walsh's equal protection challenge (majority opn, at 136, quoting San Antonio School Dist. v Rodriguez, 411 US 1, 17 [emphasis added]).
Section VI's justifications for its special membership requirements for nonpublic schools that are credited by the majority include the desires to maintain fair competition and community spirit (see, majority opn, at 137). According to Section VI, the goals of reducing "competitive imbalances" and of maintaining community spirit "would be jeopardized by unlimited or unqualified membership admittance of private schools that are able to offer financial incentives and other differentiating admission incentives to their students." (Id., at 137.) While that may well be true, the majority fails to explain how the referendum vote, as it currently operates, is a rational means of safeguarding against such feared competitive mismatching or decreased morale in the league. In other words, I cannot envision how the unqualified referendum vote reasonably ensures that student competitors of applicant nonpublic schools will be an appropriate or inappropriate match for the public schools already permitted to compete in Section VI's activities.
Indeed, no objective criteria circumscribe the discretion granted to the members participating in the referendum vote. For example, the league has not required that the voters consider such factors as whether the applicant schools had more advanced competitors because their athletic programs were more highly funded or because their students had spent *141 summers in professional training camps  considerations that might support Section VI's argument that a nexus exists between the goal sought to be achieved  fair competition  and the means instituted to achieve it  the referendum vote. However, as the voting mechanism currently stands, there is no possible way to know whether an applicant was excluded for a reason that would advance the stated goals or for some other discriminatory purpose. Further, the opportunity for mischief in this ballot exercise is apparent, since voting members may use that mechanism as a tool to further their own agendas, discriminatory or not. Accordingly, because the referendum vote bears no relationship to "level[ling the] playing field" in Section VI athletics (id., at 138), and in fact can be just as easily used to advance other, less favorable objectives, I cannot conclude that use of that criterion for league admission is a constitutionally acceptable State action (Louisiana High School Athletic Assn. v St. Augustine High School, 396 F.2d 224, 228 [5th Cir 1968]; Matter of Friends Academy v Section VIII of N. Y. State Pub. High School Athletic Assn, 154 Misc 2d 1).
The majority reaches its contrary conclusion by misreading the holding of St. Augustine as one based on a suspect classification and strict-scrutiny analysis.[*]St. Augustine involved a class action brought on behalf of nonpublic schools who were able to join the Louisiana High School Athletic Association (LHSAA)  the public school athletic league  by meeting certain admission requirements, and only then by receiving two-thirds vote of the schools in the district in which it was to compete, and a similar vote of the general membership attending the Association's annual meeting.
The District Court invalidated the two-thirds majority vote provision on the ground that it was an "arbitrary vote" (St. Augustine High School v Louisiana High School Athletic Assn., 270 F Supp 767, 776 [ED La 1967]), and that holding was affirmed *142 by the Fifth Circuit Court of Appeals (396 F.2d 224). Importantly, that provision's invalidation was not predicated on a threshold determination that any suspect classification had been created or injured by the challenged State action. To be sure, the District Court found that the proof pointed to the conclusion that racial discrimination formed the basis for the vote denying admission to St. Augustine (a school attended predominantly by African-Americans). However, its express holding was dependent solely upon the ground that "the voting requirement for LHSAA membership is an arbitrary and unreasonable method of making distinctions between applicants for membership, conducive to wholesale discrimination and arbitrary and capricious treatment of any and all candidates for membership in the LHSAA, and therefore is violative of the Fourteenth Amendment" (270 F Supp, at 777 [emphasis added]).
Employing an analysis that has compelling application here, the District Court in St. Augustine concluded that, "[r]egardless of whatever other worth" the two-thirds majority vote may have had, one of its effects was that "the voting requirement provides the LHSAA with a painless and efficient method of denying membership to any high school it wishes without the embarrassing necessity of assigning a reason for the denial" (id., at 776). The court concluded that "[t]hat effect, the enhancement of the arbitrary power of the state in these matters, affects not only so-called `Negro schools,' but each and every high school of the State of Louisiana, including so-called `white schools' as well" (id., at 776). After noting that "[e]very school seeking membership must be faced with the prospect of securing the favorable vote of two-thirds of the members of the Association" (emphasis in original), the court asked: "What other state agency or association places such a burden on the citizens seeking its aid? Certainly the very thought of such an arbitrary vote by state officers or agents is abhorrent to the principles of the Fourteenth Amendment and every civil right of all the citizens of this country, Negro or white" (id., at 776 [emphasis added]).
Thus, St. Augustine stands for the sound proposition that when the basis for the State's denial of a person's participation in a State-promoted activity cannot be ascertained, that action is irrational, and, accordingly, not even the rational basis standard of review can be met. So too, here, the voting mechanism employed by Section VI is an inherently arbitrary procedure that cannot be trusted to further any legitimate State interest, *143 much less the stated one. The majority's sanction of this tallied-vote system renders the grant of eligibility for membership in Section VI to nonpublic schools a hollow victory.
The referendum vote here is also decidedly different from the State action that survived equal protection challenge in Walsh v Louisiana High School Athletic Assn. (616 F.2d 152 [5th Cir 1980]), which the majority cites as persuasive authority here. There can be no doubt that the transfer rule upheld in Walsh, which prevented transfer students from engaging in sports for a period of one year from the date of their transfer to a new high school, was rationally related to the legitimate goal of discouraging or eliminating recruitment tactics designed to entice promising athletes to transfer to a recruiting school. In the Fifth Circuit's own words, the rule barring participation in athletics for one year upon transfer is "rationally and logically" related to that goal because it "imposes a direct cost on an identifiable event that must necessarily accompany that conduct. Moreover, by exacting its price in terms of a period of interscholastic athletic ineligibility, the transfer rule focuses its effect on athletic recruiting" (id., at 160 [emphasis added]). Rather than sending a similarly clear message to applicants that certain conduct will distinguish them from public schools for purposes of participation in the league and cause their application for membership in Section VI to be treated with disfavor, the referendum vote here can leave denied applicants with nothing more than bewilderment over the reasons for their rejection. Indeed, because applicants such as plaintiff can never know the basis for the denial of their applications, they cannot refashion their conduct in a manner that will avoid future rejection.
Accordingly, I conclude that Walsh has met its burden of showing that the voting mechanism itself  the dispositive State action  is not founded on any identifiable criteria and thus cannot serve as a reasonable basis for distinguishing between public and nonpublic schools in a manner that furthers the stated goal of matched competition. Thus, this State action is inherently unreasonable and cannot satisfy even the rational basis standard of review (see, St. Augustine, supra). As forcefully stated by the District Court in St. Augustine:
"It is certainly probable that many of the schools which voted against St. Augustine did so for reasons other than race, without any thought of discrimination, and in complete good faith. And it *144 may be that the voting provision was inserted in the LHSAA Constitution for the purpose of allowing the member schools to investigate various aspects of a candidate for membership and to cast votes based on valid and reasonable criteria for membership * * *.
"However, the latter possibility is surely no excuse for vesting such broad and arbitrary power in an association acting essentially for the state. Where such wide discretion is the ready vehicle for a covert system of discrimination, the practice must be held in and of itself violative not only of the equal protection clause, but of the basic due process guarantees of the Constitution. In this case * * * there is simply no way of ascertaining positively why St. Augustine was refused membership in the LHSAA by a vote of 185 to 11. The very fact of that impossibility is the best reason and rationale for prohibiting such subtleties as this voting provision from interfering with the very important rights of all citizens to the equal protection of the laws. We need not call the 196 school principals who voted on the issue to testify in order to determine whether 120 of them voted against St. Augustine for racial reasons. We simply rule that no school which meets the express and objective qualifications for membership in LHSAA may be denied admission on the basis of an arbitrary vote of the members. The state simply may not employ practices which leave such a large amount of discretion in the hands of state officials, at least in circumstances and situations where definite standards may easily be fixed without sacrificing fair and efficient administration." (St. Augustine, 270 F Supp, at 776-777, supra [emphasis added].)
To my knowledge, no such arbitrary voting mechanism used to distinguish among participants in a State-promoted activity has ever survived an equal protection challenge, and I am convinced that the referendum vote employed here should suffer the same fate. Accordingly, I respectfully dissent, and vote to reverse the order granting summary judgment to defendants, and grant the summary judgment motion in favor of plaintiffs, declaring that the Section VI referendum vote is unconstitutional.
Order affirmed, with costs.
NOTES
[*] The majority's misreading of St. Augustine as a "strict scrutiny" case also led it to disregard Archbishop Walsh's citation to Matter of Friends Academy v Section VIII of N. Y. State Pub. High School Athletic Assn. (154 Misc 2d 1, supra), which invalidated a similar referendum vote on equal protection grounds in reliance on St. Augustine. The court in Friends not only expressly adopted the rational basis test and declined to employ strict scrutiny analysis, but also correctly noted that the court in St. Augustine had rested its holding not on strict scrutiny analysis, but on the ground that such an arbitrary voting provision was abhorrent to the very principles underlying and protections afforded to every citizen by the Fourteenth Amendment (154 Misc 2d 1, 11).